## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| R. LAWRENCE HATCHETT, M.D., individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>vs.<br><br>HENRY SCHEIN, INC.; PATTERSON CO., INC.; AND BENCO DENTAL SUPPLY CO.; AND UNNAMED BECTON DISTRIBUTOR CO-CONSPIRATORS<br><br>          Defendants. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF ILLINOIS ANTITRUST ACT §§ 10/3(2), 10/7(2)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff and other members of a proposed Class of persons purchasing dental care in Illinois have been overcharged by a long-term, price-fixing conspiracy implemented by distributors Henry Schein, Inc. ("Schein"), Patterson Companies, Inc. ("Patterson"), and Benco Dental Supply Company ("Benco") (collectively "Defendants"). This conspiracy is *per se* an unlawful restraint of trade which has inflicted above-competitive pricing on thousands of Illinois independent dental practices, orthodontic practices, and dental laboratories (collectively "independent dental practices") purchasing dental supplies from the Defendants, as well as buying groups purchasing for these practices. In turn, these practices have passed on, all or in part, the unlawful overcharging to those receiving their dental care. Under this Court's diversity jurisdiction, Plaintiff seeks a remedy for this indirect antitrust price injury pursuant to the Illinois Antitrust Act, 740 Ill. Comp. Statute § 10/7/(2).

Defendants are Respondents in a pending proceeding before the United States Federal Trade Commission ("FTC"), Docket No. 9379, alleging that they conspired to refuse to negotiate with buying groups, which is part of the anticompetitive conduct alleged below.

## NATURE OF THE ACTION

1.      Defendants are the three largest distributors of dental supplies in the United States. They are insulated from competition by high barriers to entry in the relevant market(s) which have been heightened by the conspiracy's collusion. The Defendants' conspiracy accounts for between 80% and 90% of sales of dental supplies nationwide.

2.      To allow them to fix prices at well above-competitive levels, and earn well above-competitive margins, Defendants have engaged for many years in three anticompetitive schemes. *First*, they have boycotted dental buying groups serving Illinois independent dentists which seek lower supply pricing. These groups have fostered competition by endorsing, or joint venturing with, discounting distributors competing with the Defendants and providing these competitors efficient access to Illinois independent dentists. Discounted sales to these buying groups threatened the Defendants' collusive above-competitive pricing and historically high profit margins.

3.      *Second*, Defendants have expressly agreed to fix their pricing at specific, above-competitive levels which are consistent with maintaining their gross margins in the range 26% to 28% or more and well-above competitive returns. Defendant Schein is the largest distributor nationwide of dental supplies. As its Regional Manager Mark Lowery put it, the aim of the scheme to directly fix pricing and margins at specified levels ensured that dentists "get[] [dental products] for the same price no matter who they buy [them] from" so that "we all get paid," and the scope of this scheme has run "unanimously across the industry [for] as long as [I have] been in the dental business."

2

4.      *Third*, the cartel has conspired to prevent the entry and expansion of competing, discounting distributors by boycotting, or threatening to boycott, manufacturers supplying the discounters by denying these manufacturers Defendants' essential distribution. Also, the cartel has colluded to boycott, or threatened to boycott, the trade shows of state dental associations promoting state-wide buying groups seeking to generate supply savings for their independent dentists.

5.      Each Defendant is jointly and severally liable for all antitrust price injury and damages inflicted on the proposed Illinois Class by the conspiracy without right of contribution.

## JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction over this matter under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and members of the Illinois Class alleged herein are citizens of Illinois, whereas each Defendant is a citizen of a State other than Illinois.  28 U.S.C. § 1332(c)(1).

7.      Venue is proper because Defendants reside within this District and are subject to personal jurisdiction within this District. 28 U.S.C. § 1391(b). Defendants maintain offices, regularly transact business, have agents, and/or are otherwise found within this District.

8.      Each Defendant has significant contacts with the State of Illinois and this District, and Defendants' conduct occurred at least in part in this District, has affected commerce in this District, and/or has caused injury, including to Plaintiff, in this District.

## PARTIES

9.      Plaintiff R. Lawrence Hatchett, M.D. ("Plaintiff") resides in this District and has paid for, all or in part, dental services from an independent dental practice in this District over the last four years.  This practice purchases its dental supplies from Defendant Schein. Plaintiff has been overcharged for these dental services and procedures due to antitrust price injury fairly

3

traceable to conduct of the conspiracy alleged below.  Dr. Hatchett has had in the last four years crown, molar-extraction, and other procedures provided by two independent dentists located in this District.  Dental supplies purchased in part from Defendant Schein used in these procedures have included x-ray accessories, materials associated with crown installation (impression materials, instruments, etc.), binding/cement material, core build-up material including pins, topical fluoride, and anti-oxidant rinse. Dr. Hatchett has paid several hundred dollars for these procedures.

10.     Defendant Henry Schein, which is incorporated under the laws of Delaware with its headquarters in Melville, New York, is the nation's largest distributor of dental supplies.

11.     Defendant Patterson, which is incorporated under the laws of Minnesota with its headquarters in St. Paul, Minnesota, is the nation's second largest distributor of dental supplies.

12.     Defendant Benco, which is incorporated under the laws of Delaware with its headquarters in Pittston, Pennsylvania, is the nation's third largest distributor of dental supplies.

13.     Various other individuals and entities not named as defendants herein participated as co- conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy.

## A PER SE UNLAWFUL CONSPIRACY TO FIX PRICING FOR DENTAL SUPPLIES
### Boycott of Buying Groups

14.     Defendants have consciously committed to a common scheme to fix high prices for dental supplies in relevant market(s) for the distribution of dental supplies in part by agreeing not to compete for the business of buying groups serving independent dentists to avoid discounting their fixed prices. These groups foster competition by endorsing, or joint venturing with,

discounting distributors and providing them efficient access to independent dental practices in Illinois and elsewhere in the nation.

15.     With many inter-firm communications, Defendants have privately discussed the potential impact of buying groups on their collusive pricing and have agreed on a coordinated response. These communications were not casual or accidental. They have been among Defendant leaders at the highest level and repeatedly reference their agreement to suppress buying group competition in writing:

- Confidential and not for discussion . . . our 2 largest competitors stay out of these [buying groups] as well. . . . If you hear differently and have specific proof please send that to me.

- Schein, Benco, and Patterson have always said no [to buying groups].

- Maybe what you should do is make sure you tell [Schein] and [Patterson] to hold their positions as we [at Benco] are.

16.     Each Defendant understood that the buying group model could result in a significant decline in its pricing and margins, which had occurred in the market for the distribution of medical supplies when buying groups entered. The Defendants feared that if one of their number sold to buying groups, there was a significant risk of "other competitors then following suit" resulting in, as the largest Defendant Schein put it, a "*huge price war.*"  Benco and Patterson shared this concern. Rather than letting competition run its course, Defendants chose to violate the antitrust laws.

17.     The Defendants' executives knew these communications were unlawful and have testified that they made them feel "uneasy," and were "against company rules." These repeated inter-firm communications could only be in aid of coordinating highly-pernicious anticompetitive conduct. There was no procompetitive justification.

18.     As the smallest Defendant distributor, Benco had the most to gain by selling to buying groups because they offered it the potential upside of a new customer base. Benco had the most to lose, however, if the other Defendants also discounted.  It had a longstanding policy of not selling to buying groups but knew this policy was not sustainable if Patterson and Schein began selling to them.

19.     Defendants Benco and Schein thereupon entered into an agreement to refuse to deal with buying groups in 2011 when these groups first started to take hold. Schein President Tim Sullivan and Benco Managing Director Chuck Cohen had a close relationship and Cohen initiated contact with Sullivan after he learned that Schein was selling to buying groups. They exchanged competitively-sensitive information regarding bidding on buying group business by a series of telephone calls, emails, and text messages. Schein then committed to the conspiracy by abruptly altering its prior position and refusing to sell to these groups. Each company thereupon sought to ensure that the other upheld its end of the bargain and confronted each other multiple times with suspicions of cheating.

20.     In September 2011, a buying group Smile Source approached Benco offering it the opportunity to take supply business from Schein. Over the next several weeks and months, Cohen and Sullivan exchanged numerous communications, (including dozens of text messages and multiple telephone calls) in furtherance of their agreement and neither pursued this business.

21.     In early 2013 Patterson then joined the buying group collusion. Dr. Brent Mason and other independent dentists in New Mexico created a new buying group called the New Mexico Dental Cooperative ("NMDC"). Dr. Mason sent an email to prospective members informing them that NMDC had "partnered with Patterson Dental." When Benco's Cohen learned of Patterson's potential sales from a Benco salesperson, he wrote on February 8, 2013, "[w]e

don't recognize buying groups . . . I'll reach out to my counterpart at Patterson to let him know what's going on in NM."

22.     Five minutes later, Cohen forwarded the email chain to his Patterson counterpart, then- President Paul Guggenheim:

> Just wanted to let you know about some noise I've picked up from New Mexico. FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups (though we do work with corporate accounts) and our team understands that policy.

23.     Guggenheim immediately forwarded the email to his VPs of Sales David Misiak and Marketing Tim Rogan letting them know of Benco's competitive position. A few hours later Guggenheim accepted Cohen's invitation to collude: "Thanks for the heads up. I'll investigate the situation. We feel the same way about these."

24.     Three days after the communication between Cohen and Guggenheim, Patterson decided not to put in a bid to work with the NMDC as originally expected. This came as a surprise to Dr. Mason who testified that, prior to February 8, 2013, he understood that Patterson had agreed to be the preferred vendor for the buying group. Further, within a few weeks of entering into the conspiracy, Patterson began instructing sales representatives to "stay out" of buying groups. Patterson's salesforce understood the "clear" message that Patterson "steer[ed] clear of all buying groups."

25.     Shortly after Patterson joined the conspiracy, Misiak directed a Regional Manager not to sell to a buying group, explaining that Patterson's largest competitors refuse buying groups as well:

> Confidential and not for discussion … our 2 largest competitors stay out of these as well. If you hear differently and have specific proof please send that to me.

26.     Misiak could not have spoken confidently of Schein and Benco's participation in the conspiracy without knowledge of their collusion. Misiak also sought to keep his message secret which is further evidence of the conspiracy.

27.     Also, in 2013 Patterson created a Special Markets division to manage large accounts. The President of this new division, Neal McFadden, sent a memorandum to regional and branch managers explicitly excluding the possibility of selling to buying groups: Special Markets "definition will not include group purchasing organizations (GPOs)." In compliance with that directive, Patterson consistently denied sales to buying groups. For example, it turned down Smile Source in 2013 in spite of its members' annual spend of $1.4 million.

28.     Patterson actively monitored and confronted Benco with its suspicions of cheating. In June of 2013, Guggenheim confronted Cohen when Patterson suspected Benco of working with a buying group in violation of the agreement. Guggenheim wrote: "Reflecting back on our conversation earlier this year, could you shed some light on your business agreement with Atlantic Dental Care? . . . I'm wondering if your position on buying groups is still as you articulated back in February?" In response, Cohen provided a detailed explanation of the basis for Benco's work with Atlantic Dental Care because it did not believe it was a buying group.

29.     In August 2013, Patterson's VP of Marketing Rogan cautioned McFadden, who was interested in exploring sales to a buying group: "We don't need GPO's in the dental business. Schein, Benco, Patterson have always said no. I believe it is our duty to uphold this and protect this great industry." Following this exchange, McFadden did not pursue the business.

30.     In May 2015, Benco's Ryan turned down Dentistry Unchained, a buying group with 226 dentists: "The best part about calling these [buying groups] is I already KNOW that Patterson and Schein have said NO."

31.     On July 13, 2015, Ryan clarified Benco's position to a sales representative who was concerned about losing $1 million in "current business" to a buying group: "We don't allow [volume discount] pricing unless there is common ownership. *Neither Schein nor Patterson do either."*

32.     Defendants also communicated about the buying groups created by the Texas Dental Association ("TDA") and the Arizona Dental Association ("AZDA") and coordinated a response. In October 2013, TDA launched a buying group referred to as TDA Perks. On October 14, 2013 Benco's Cohen—again acting as ringleader— instructed his regional manager in Texas to contact Schein and Patterson to discuss cutting back support for TDA's meetings and programs because TDA was starting a buying group. The regional manager, Ron Fernandez, contacted Patterson and Schein to coordinate. The next day, Schein regional manager, Glenn Showgren, provided a detailed report of his call with Benco's Fernandez to his supervisor:

- Benco considering suspending all activities with the TDA including pulling out of the state show

- [Benco] Chuck Cohen will be reaching out to, or has reached out to, [Schein] Tim Sullivan to see if HSD would do the same thing

- Ron wanted to know if I have a relationship with local [Patterson Regional Manager] to see if they would consider pulling out as well

- I will be having lunch with Ron week after next to discuss concerns and share what we have found out about the program

- I laid out ground rules that I will NOT discuss a pricing response and any action would have to be cleared by my Legal Team before communicating with the TDA

33.     Later, high-ranking executives at Schein and Patterson communicated about a coordinated response to TDA Perks as well. In January 2014, Schein's VP of Sales (Dave Steck) informed his counterpart at Patterson, Misiak, that Schein was planning to pull out of the TDA meeting. The two spoke on the telephone on January 6, 2014 for 14 minutes. Steck followed up

9

with an email on January 21, 2014, under the subject matter "Texas," saying, "I'll be calling you to let you know about our decision on the matter we recently discussed in the next couple days." Misiak forwarded Steck's email to his colleague (Rogan) and wrote, "He already told me they were out. Full blown!" Rogan responded, "That sucks. You should call him. 'Thought I could trust you' type of conversation."

34.     Following these communications, Schein's Randy Foley explained that the Defendants were on the same page regarding TDA: "The good thing here is that PDCO, Benco and us are on the same page regarding these buying groups/consortiums. Checking to see if we should join the TDA boycott."  Schein withdrew from the TDA meeting in early April.  Benco pulled out the same day because "Schein & Patterson are as well."

35.     A few weeks before TDA's annual meeting, Cohen emailed Sullivan and Guggenheim on the same email chain about the TDA buying group, forwarding an article promoting the TDA Perks program. Sullivan and Cohen spoke that same day by telephone, and Guggenheim and Cohen spoke on the telephone a few days later regarding the "TDA Perks letter."

36.     Schein, Patterson, and Benco engaged in a similar pattern of inter-firm communications regarding the AZDA in July 2014. Following these communications, the Defendants pulled out of the state dental association meeting. The communications between Benco and Schein, and Schein and Patterson, combined with Defendants' withdrawal from the trade association events (that they otherwise regularly attended) constitute additional direct evidence of the agreement.

### Collusion to Fix Pricing and Margins
### At Above- Competitive Levels

37.     In addition to boycotting buying groups to prevent price discounting in the relevant market(s) for distribution of dental supplies, the Defendants conspired, when dealing with

10

independent dentists, to specify their fixed pricing at above-competitive levels sufficient to maintain their gross margins in the range between 26% and 28% or more.

38.     This was orchestrated through private meetings at professional events, personal gatherings, text messages, phone calls, business and personnel email messages, and intermediaries, including, *e.g.*, the sales representatives and executives of dental supply manufacturers. Further, high level employees of Defendants frequently move among the Defendants which facilitates collusion.

39.     A Patterson employee confirmed the breadth and scope of this price fixing collusion. He observed that during the period from 2011 to 2015, when he was responsible for dental sales for Patterson, he was not permitted to go below set minimum threshold of 28% to 30% on supplies. This threshold was implemented on a nationwide basis. He recounts that, during his tenure, it was known throughout Patterson's sales division that Schein would not go below 32% and he would compete, if at all, for business on a basis other than price. He was regularly informed by others within Patterson that they knew that Schein would not go below a certain price.

40.     A former sales representative, who worked for Patterson and Benco, learned about gross margin thresholds at both companies from his managers, at monthly sales meetings, and during training sessions. He recalls that these thresholds were documented in handouts provided at monthly meetings. At both companies, the minimum margins were similar during his entire 15-year tenure in the industry.

41.     On August 31, 2012, Archer & White ("Archer"), a discounting distributor, filed an antitrust suit against Schein, certain dental manufacturers, and unnamed co-conspirators alleging price fixing and exclusionary group boycotting. Just before this suit was filed, Ben Cohen, the head of Benco**,** which was not named as a defendant in the lawsuit, learned that the suit was

imminent. He called James Archer of Archer to dissuade the company from pursuing the lawsuit, offering almost $1 million by way of settlement, and urging Archer "to make the whole thing go away without a lawsuit." He suggested that, even though Benco was not a party to the lawsuit, its filing "will not work for Benco on a lot of different levels."

42.     That Benco, a supposed competitor of companies facing a serious antitrust lawsuit, would offer to pay to make the suit go away to protect its supposed competitors is an action against self-interest indicative of collusive behavior. Absent Benco's participation alongside other Defendants in the pricing conspiracy, it made no business sense for Benco to indemnify Archer for the anticompetitive conduct of its rivals.

43.     Underscoring Defendants' knowledge of their wrongdoing, Jack Powers, who was employed by a smaller distributor of dental supplies that is a co-conspirator but not named as a defendant here, Burkhart, told Schein's Lowery and Dynamic Dental's ("Dynamic") Skip Pettus in 2008 that they "have to be very careful, if a customer doesn't like us, they could have us all up on price fixing. . . ." or ". . . somebody complaining about getting together as a group and saying: Okay, well, we're going to hold to a certain margin."

44.     From 2004 until 2008, Archer and its joint-venture partner Dynamic were relatively small distributors (contrasted to Defendants), but nonetheless sold supplies nationwide, selling to 16,000 customers and earning millions of dollars in revenue annually. They offered equal or superior service, at markedly lower prices, causing a Schein employee to quip that the Defendants looked like "idiots" when they tried to compete against Archer using their collusive pricing. Powers of Burkhart confided to Archer's Pettus that Dynamic had hurt Schein and Patterson at the national level. In fact, dating back to 1997, Archer had been told by Mark Mlotek, Schein's then

in-house counsel, that if Archer refused to sell the business to Schein, Schein would put it out of business.

45.     By 2008 the Defendants' boycotting conduct had put Dynamic out of business. This boycott also had substantially impaired the ability of Archer to sell multiple lines of products or to compete effectively against the Defendants on a national level.

46.     In June of 2008, suffering from the Defendants' group boycott, an Archer sales representative, Pettus, met with Schein's Lowery and Burkhart's Powers. In that meeting, Pettus learned of the Defendants' long-standing price fixing conspiracy. Messrs. Lowery and Powers offered to end the group boycott of Archer if Archer agreed to maintain margins on their sales of dental products between 32% and 34%, the margins agreed upon by the conspirators

47.     During this meeting, Schein's Lowery suggested to Archer's Pettus that if Archer "took price out of the equation, you know, you'd probably get along with more of the local people." He did not want to get beat on a sale "because of price" and that "I'd like to think I know where … Jack [of Burkhart] is going to come in at [on price]." Lowery "consider[ed] Jack a good competitor. I like Jack." Lowery added, "[e]ven your vendors [manufacturers] that you do have, I think you'll get to maintain better relationships with them if you don't drop your drawers [offer low prices]," and that "if I'm not going to do it [enforce the boycott], they're going to put somebody else in my place to do it [enforce the boycott]."

48.     Urging Archer to raise prices, Schein's Lowery queried, "Are you making money over there? . . . I mean, if you are making money, I'm going to say you probably thought you were going to make more money than what you're making."

49.     Archer's Pettus pointedly asked what he had to do to "get along" with Defendants, to "get to a professional level" or be "accepted into the market" "just like a [Burkhart] or a Patterson is." Lowery reiterated that Archer's low pricing, or "drawer dropping," was the problem:

> . . . [W] all have the ability to drop our drawers. You know we do. But . . . that's part of . . . the mutual respect with Jack . . . We all want to make a living. We . . . all . . . are going to sell . . . at a good price where we all get paid.

50.     Schein's Lowery also acknowledged the Defendants price fixing collusion where they would not undercut one another's prices: "If [customers] are price-checking you, that's the time to drop your drawers, . . . [but] that obviously muddies up the water . . . so, you know, I know probably Jack [of Burkhart] won't  . . . drop his drawers]. I think that's just keeping the integrity of the margins [prices]. . . . If they want [us] to sell without [high] margin [prices], I'm not even going to price it out." Confirming Lowery's intentions, Archer's Pettus replied: "What I'm hearing you say from a company standpoint, . . . [our] margins [have] got to be better [higher], especially on equipment." Lowery responded, "Yeah, . . . that seems to be the Achilles heel." Pettus confirmed: "[our] [l]ow margins on [dental] equipment?" Lowery responded, "Yeah."

51.     As to Archer's intention to reinsert itself in the relevant distribution market as a full-service, nationwide dealer if the Defendants' boycott ended, Lowery asked: "Are you, are you still trying to be a full-service dealer? . . . You've got to have the full [line]?" Pettus answered, "I've got to have the full lines or, I - I mean . . . it doesn't work."

52.     The conversation then became more pointed. Archer's Pettus asked: "Let me just cut right to the . . . chase . . . there's indicators by . . . manufacturers that . . . there's been direct talk from [Schein] and others of: Hey, we just don't want him [Archer] in existence. Don't open him. Don't do whatever. If [Archer] raise[s] our prices, can we get relief from that? . . . If I raise my margins on equipment to an acceptable level . . . can there be relief?"  Schein's Lowery

14

responded, "What . . . we don't want to do is come across [as] dictating the price to the end user. That will get us in a lawsuit. Guarantee it. But you know, a couple things. One is I think when everyone plays on the same field, it makes things a lot easier."

53.     Despite Lowery's concern that discussion of pricing was guaranteed to get Defendants into a lawsuit, that is precisely what he proceeded to do for the remainder of the conversation.

54.     Describing his discussion with the manufacturer Dental EZ about supplying Archer, Lowery recalled "whatever you're doing over there [with Archer's margins] make sure you're doing the same thing here. Because if you're going to be off, I'm going to know about it and you know, that's not going to fly. And that's when I'll shoot that up to corporate. But if we're all on the same playing field [charging the same margins], I said, we're cool."

55.     Lowery then described how he wanted Archer to fall in line with the collusive pricing: "If we're both quoting a deal, let's make sure that we're both getting the same thing. . . . And you're selling it, if you're not going to be selling it, Jack [Burkhart] is going to be selling it, [or] Patterson's going to be selling it. . . . but I just want to make sure we're all on the same page. . . . Will my reps continue to call on your accounts? Absolutely. Will you continue to call on mine? Absolutely. But we know that the customer is making a decision based upon who they want to do business with -- not because we're slugging it out and killing each other on margins [prices]."

56.     Lowery described Defendants as "the cool crowd," that it was "like high school" and that when Archer came on the scene, "[w]e'[d] already made our friends -- and you're not part of the cool crowd. We're the cool crowd."

57.     Archer's Pettus responded: "That's why I wanted to come in today and say: Okay, what can I do to where I'm not going to have to take a step back, to where I can continue to do

[business in the market]." Lowery responded that he "th[ought] you got your answer on that. . . . Let's play on the same field. . . . We can play ball together."

58.     Pettus asked whether "if I focus on that, if I maintain margins high, can I . . . rest assured that we're," and Lowery interrupted "[l]et's all just, you know, have the same goal in mind. . . . So that way it takes us out of the loop as far as slugging it out [on margins], and the doctor gets it for the same price no matter who they buy it from."

59.     Questioning what the "same price" was, Pettus noted, "I don't know what's good and what's bad," but before he could finish Lowery again interrupted, "North of 32 [percent margins]." Surprised by the high number, Pettus responded, "Really?" Mr. Lowery: "Yeah."

60.     Pettus then asked "[i]f I'm buying at the same as you're buying and we're going up competitively against people not against price, I need to be north of 32 every time?" Lowery's response confirmed the breadth and scope of the conspiracy: "You know, *unanimously across the industry*, as long as I've been in the dental business -- 32 -- and I know guys that actually get 34 on stuff . . . but you know, generally speaking, you know, 32 is always good . . . If you get 32 . . . everyone is going to get paid on it . . .  I think if you get down [to] 28, we all don't make a lot." He reiterated the ubiquity of the price fixing conspiracy among Defendants: "that's where we play ball at."

61.     Acknowledging the price discipline that Archer imposes on Defendants absent the Defendants' group boycott, Lowery admitted: "You know, 34? You know, if you get shopped [price checked] on [34] from Dynamic Dental, gets…your head handed to you [by the customer], you look like an idiot. . . . Now add those numbers up. 25 [percent margins]? I won't even freaking touch it."

16

62.     The propensity of dental practices to price check, and the fear of getting "your head handed to you" if your prices were out of line with the competition, highlights not only the competitive threat posed by distributors like Archer, which offered discounted margins ranging from 15% to 25%, but also that Defendants' price fixing would be ineffective absent the participation of the major distributors.

63.     In another conversation between Archer's Pettus and Burkhart's Powers on or about June 2008, Powers acknowledged the illegality of the price fixing conspiracy, saying that discussing margins makes him "uncomfortable," noting that "it's a funny country that we're living in right now, different country, with some laws and things like that, you know, about competitors getting together."

64.     Demonstrating the high level of familiarity and cooperation between Defendants, Powers described their relationship with one another as follows: "I think we trust each other" and that "all of these people could . . . call and ask for a favor and . . . I don't, I can't even remember turning *one* of them down."

### Boycotting Suppliers and State Buying Groups Doing Business with  Discounting Competitors

65.     In addition, as a third scheme in aid of their price fixing cartel, Defendants successfully boycotted several prominent actual and potential distribution competitors to suppress their emerging threats to collusive pricing, including Archer (with its joint venture partner Dynamic), SourceOne, and Amazon.com, Inc. ("Amazon").

66.     In some cases, the Defendants give the discounting competitors a choice. Join the cartel and raise their pricing or the Defendants would boycott them by pressuring manufacturers and state dental associations forming buying groups not to deal with them.

67.     As to competitors not joining the conspiracy, Defendants jointly leveraged their power over manufacturers to suppress the discounters' competition at least as far back as 2008 and did the same with buying groups sponsored by state dental associations at least as far back as 2013.

68.     All else being equal, Defendants' price fixing, and resulting above-competitive profit margins, should have enticed rival distributors to enter and expand in the relevant distribution market(s) by offering lower prices and earning lower, but still profitable, margins. They could pay manufacturers more for their products than Defendants, while at the same time charging dental practices less for the same products. This enhanced competition should have, in turn, forced the Defendants to lower their collusive prices to competitive levels (or lose enough market shares making their collusive pricing unprofitable).

69.     At least as far back as 2004, Defendants' high prices and profit margins did in fact entice rival distributors to attempt to expand their market presences. However, their efforts were stymied by Defendants' boycotting (through manufacturers and state dental associations) to impair this competition.

70.     To successfully enter or expand, a rival distributor must be able to: (a) offer a comprehensive line of dental supplies; (b) purchase products in sufficient quantities to avail themselves of economies of scale; and (c) efficiently reach a sufficient number of dental practices.

**Discounter SourceOne**

71.     In October 2013 SourceOne, a new supplies distributor with a wide-ranging product offering comprised of over 50,000 dental supplies, created a dental supplies distribution platform in partnership with the Texas Dental Association ("TDA"). *Supra* ¶¶ 32-36. SourceOne's existing e-commerce platform, which operated nationwide, was already a lower-priced distribution option vis-à-vis those of Defendants. Its new sales platform, "TDA Perks Supplies," offered dental

practices the opportunity to avail themselves of even lower distribution prices, an average of 30% below those of Defendants. The platform was an immediate success and quickly positioned itself for nationwide expansion. Rivals besides SourceOne, drawn to the platform's initial success, began planning efforts with other state dental associations to implement similar programs.

72.     With the advent of an efficient national competitor that threatened their cartelized prices and sizeable profit margins, Defendants' reaction was swift, fierce, and coordinated. This boycott aspect of the price-fixing conspiracy began in mid-to-late-2013, continues to the present, and involves three interrelated actions.

73.     First, Defendants threatened manufacturers in concert: should they sell their products through SourceOne, Defendants would refuse to sell or refuse to actively promote the manufactures' products through their distribution channels. Because Defendants controlled nearly 80% to 90% percent of the distribution market, the loss of Defendants' distribution would have been devastating to these manufacturers. Defendants' collusive threats continue to be successful in coercing manufacturers to abandon or forgo business relationships with SourceOne.

74.     These cut-off products represent a substantial portion of SourceOne's business. SourceOne abruptly lost access to dozens of product lines, including many of SourceOne's most important and highest-selling items. By April 2014 SourceOne had lost access to at least 75% of its top selling products, crippling its ability to compete with Defendants.

75.     One of SourceOne's suppliers, an intermediary distributor called DDS Dental Supplies, told SourceOne that it would no longer supply SourceOne because of pressure applied on manufacturers by Defendants. Similarly, DMG America, a manufacturer of dental restoration products, told DDS Dental Supplies that it would no longer allow its products to be supplied to SourceOne because of the Defendants' threats.

76.     Other manufacturers that abruptly stopped allowing their products to be sold through SourceOne include Sultan Healthcare, Danaher, Heraeus Kulzer, Ivoclar Vivadent, Quala, and Septodont. None of these manufacturers or intermediary distributors had ever voiced any concerns with SourceOne until after the 2013 announcement of SourceOne's innovative new distribution platform and the beginning of the group boycott. Their decisions to stop selling to SourceOne were contrary to their own economic interests (in the absence of the group boycott), as they forfeited significant future revenues that would have been earned by continuing to sell to SourceOne.

77.     When SourceOne sought replacement suppliers, candidates, including DHP Dental, were deterred from doing business with SourceOne as a result of Defendants' group boycott.

78.     Second, Defendants boycotted the annual meetings and trade shows of state dental associations that were forming buying groups and partnering or doing business with SourceOne and threatened to boycott those that were considering the same.

79.     As alleged above, an important way to reach dental practices and manufacturers efficiently is through buying groups. Source One has attempted to joint venture with state dental associations forming these buying groups state wide. Traditionally, Defendants have sent sales representatives to participate in the annual meetings and trade shows of state dental associations, and state dental associations depend on the revenues generated by the participation of major distributors like Defendants at these events. In March of 2014, a Patterson representative met privately with TDA representatives and demanded that the TDA end its relationship with SourceOne, or Patterson would withdraw from the TDA's annual trade show and refuse to advertise in the TDA's publications. In April of 2014, a Schein representative privately delivered an identical message. These threatened boycotts were coordinated and deterred other state dental

associations that had expressed interest in partnering with SourceOne from doing so, including, *inter alia,* the Colorado Dental Association, the Illinois Dental Association, and the Virginia Dental Association.

80.     In the absence of the group boycott, SourceOne's new program would have spread the nation rapidly, as evidenced by an April 9, 2014 email, in which a representative of the TDA wrote the "next link" in SourceOne's "unfolding saga" would be that "the American Dental Association and most large states would [be] onboard in a nano-second, and that is the reason for the suppliers' fear." And in a February 3, 2014 email from Schein to the TDA, Schein's Dean Kyle threatened the TDA: "I am concerned the Board does not understand the far reaching impact" of its decision to endorse and partner with SourceOne.

81.     When state associations refused Defendants' demands, Defendants carried through on their threats to boycott annual trade shows. They refused to attend trade shows organized by the TDA in 2014 and the AZDA in 2015 and forfeited substantial deposits advanced to the associations. A boycott of the Louisiana Dental Association's ("LDA") 2015 annual show was avoided only when the LDA abandoned its plans to associate with SourceOne.

82.     Defendants were the only distributors not to attend the TDA and AZDA events and dozens of dental supplies manufacturers also refused to attend TDA's 2014 trade show pursuant to Defendants' demands that they stay away. These manufacturers told TDA and AZDA that their decision to pull out of their events was a result of pressure applied by Defendants. The TDA and AZDA suffered financial hardship and their events were less profitable as a result of the boycott. Since the boycott, AZDA has not actively promoted SourceOne to its membership.

83.     These group boycotts had a cascading effect on other state dental associations. The LDA, fearful of Defendants' retaliation, sought to disguise its relationship with SourceOne,

planning to announce the business relationship only after their annual trade show. Unfortunately, Defendants learned of the planned relationship in advance of the event and again threatened a boycott. In light of Defendants' recent boycotts of TDA's and AZDA's events, LDA abandoned its endorsement of SourceOne.

84.     The Colorado Dental Association ("CDA") reported to SourceOne in January 2015 that it was "concerned about the major dental suppliers in our area, Schein, Patterson and others pulling their support to the CDA and our largest component society which hosts the Rocky Mountain Dental Conference each year" if it associated with SourceOne.

85.     Internal notes from the Virginia Dental Association ("VDA") reflect that Defendants' boycotts influenced the VDA not to pursue a relationship with SourceOne. The notes indicate VDA's awareness that the TDA has "had some push back from the major suppliers . . . but generally, members seem to be realizing significant savings and are happy with the [SourceOne] program." Later, the VDA observes that the push back has intensified: "TX has had some major pushback from the suppliers because of [SourceOne's] program. They had 15 companies pull out of the exhibiting [sic] at the TDA Annual meeting in response to the [SourceOne] endorsement and have had some real issues with their relationship with the suppliers. It was also noted that some [dental] offices have had issues when they need service from one of the main suppliers [Defendants Henry Schein, Patterson, and Benco] for something in the office. When they are not ordering from the [incumbent] suppliers, their priority on the repair list seems to slip." Ultimately, a November 6, 2014 email reflects that the VDA, after "really think[ing] about the consequences of [endorsing SourceOne]," including the fact that "major suppliers dealers will (are) very upset about this and won't take it laying down. I suspect they will punish [state Dental associations] in some way," the VDA forwent the opportunity to affiliate with SourceOne.

86.     In contrast, the Nevada Dental Association, which has no annual trade show for Defendants to boycott and was less susceptible to Defendants' threats, did follow through with a planned partnership with SourceOne.

87.     Defendants have also misrepresented to dentists the nature and quality of dental supplies sold through SourceOne, misrepresenting them as expired, counterfeit, altered, unauthorized, or otherwise unfit for their purpose.

88.     Defendants' boycotting has been pursued in unison. They facilitate their collusive conduct through in-person meetings at trade shows, business and personal email, and through business and personal cell phone calls and text messages. Their employees, many having previously worked for another Defendant, had close relationships through social and business gatherings and shared a common motive and opportunity to exclude SourceOne and similar competitors from the market. They acted on that motive.

89.     Defendants communicated with each other about the TDA and reached an agreement to boycott the TDA. On November 1, 2013, a Schein employee wrote to a colleague at Schein, "Let's talk with P[atterson], Benco, . . . . [and] [n]ot give TDA a dime." Another Schein representative responded, "I refuse to work with any manufacturer rep that sells through [SourceOne]. That's [what] every distributor should say. The manufacturers will get scared and pull out."

90.     On or about October 15, 2013, the Schein South Texas regional manager had a phone conversation with a Benco Regional Manager regarding TDA's partnership with SourceOne. The Schein regional manager recounted in an email that, during the call, Schein and Benco employees discussed their mutual interest in jointly boycotting the TDA and then agreed

that they would reach out to Patterson to ensure that all three would engage in a group boycott of TDA.

91.     In a February 1, 2014 internal email from DDS Dental, a dental distributor, DDS's Dr. Seznik, relays that "Patterson was encouraging Schein to support them in pulling out of meetings" for state dental associations that supported SourceOne.

92.     A March 31, 2014 email thread forwarded by David McCarley of McCarley Dental reflects that at the South Dental Convention:

> some of the vendors say that they were told by both Patterson and Schein not to have anything to do with TDA Perks or they would shelve their products nationwide. . . . when I spoke with a Schein rep at their normal sized [booth], he said that they were still having higher-up corporate discussions on whether they would attend the TDA or not, and that Benco was discussing the same. . . . [T]hey really do think that they can derail the [SourceOne] Perks program.

93.     That same email thread reflects that "Big Dental Suppliers are sending false info to Dentists [about SourceOne]. Patterson reps have even called the TDA pretending to be Dentists complaining. We have traced the calls back to the Reps. . . . If this is true I am sure the Board will cut ties immediately with SourceOne."

94.     An April 21, 2014 SourceOne email, with the subject line "Group Boycott of our company organized by largest dental suppliers," reflects that "TDA has received a significant number of cancelations for their annual session (April 30–May 3) from a variety of manufacturers previously confirmed to exhibit. Many of them cited pressure from both Henry Schein and Patterson as the reason for the last-minute cancelation. Many of them informed the TDA that they were specifically threatened by both companies that if they did not cancel their attendance at the conference, various unpleasant things would happen to them."

95.     Boasting about the efficacy of their group boycott, Benco tweeted the day before the TDA's meeting was scheduled to start: "texas meeting will not be the same without key venders there. #skiptheTDA" on April 29, 2014. The tweet appears to have since been deleted.

96.     A July 22, 2014 email from Mike Wade of Benco to Patterson's Daniel Reinhardt reflects that "[w]e are of the same mindset. It would be gratifying to see every distributor with a local presence make a unified statement on the AZDA's ill-conceived idea" to endorse SourceOne. Reinhardt confirms in that communication that "we will be pulling our sponsorship and attendance of the state meeting" and Wade confirms that they are "looking at pulling our sponsorship." Wade also confirms that he "know[s] that Patterson, Schein and Benco boycotted the Texas Dental Association meeting this year after the TDA did the same thing and wanted to see if we could create the same message here in AZ."

97.     On July 30, 2014, Benco's Wade wrote about the AZDA boycott to Brian Goslee of Dentsply, a dental manufacturer, writing: "I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's [AZDA's] meeting next year."

98.     And on August 1, 2014, a Benco email discussing the boycott of the AZDA's 2015 trade show notes that Benco is "extremely disappointed that the AZDA has decided to directly compete with Benco and our fellow distributors," and that Benco is "not alone in evaluating [its] participation in AZDA events. Both Patterson and Schein *leadership* have expressed that they will also review participation if the AZDA continues to" affiliate with SourceOne.

99.     Indeed, six months before Defendants' group boycott of the TDA's annual conference—and also months before the TDA itself learned that the three Defendants (as well as those manufacturers over which Defendants exercise influence) would not be attending—a sales

representative from Tuttnauer, a manufacturer of dental vacuums and other products, visited Archer. This sales representative informed Archer that Defendants had agreed to boycott the TDA's event and that Tuttnauer and other manufacturers intended to join the boycott as a result of pressure from the Defendants and encouraged Archer to boycott the event as well. The Tuttnauer representative specifically mentioned that the planned boycott was in reaction to the TDA's affiliation with SourceOne. Archer declined to participate in the boycott and attended the TDA's event.

100.    There is no pro-competitive justification for the group boycott by Defendants in aid of their price and margin fixing. In particular, Defendants forfeited substantial deposits at state dental association conferences. As Benco's Managing Director Rick Cohen publicly stated with regard to the importance of such trade shows: "not attending trade shows is not an option for us" because it would risk losing customers to attending distributors. This is why it was necessary for Defendants to boycott as a group. If they collectively agreed not to attend, none would lose business to the other and the business risk from the boycott diminished dramatically.

**Discounter Amazon**

101.    Defendants also boycotted other distribution competitors, perhaps most importantly, Amazon, thwarting their efforts to establish or sustain themselves on a nationwide basis. The nation's largest and most successful on-line retailer, Amazon is ideally positioned to purchase and supply dental supplies at low cost and had begun to make inroads in the relevant distribution market.

102.    In a February 14, 2014 email, Schein described the competitive threat posed by Amazon: "Amazon is a freight train that will drive down margins and within 18-24 months, at the most, Team Schein will have to adapt or huge layoffs will occur."

103.    In response to this threat, Defendants agreed, as they did in response to competitive threats from Archer and SourceOne, to boycott manufacturers supplying Amazon. In 2015, soon after, at a large dental supply distributor conference held in Chicago, Defendants informed many of the manufacturers in attendance, including 3M, that if they sold to Amazon, Defendants would cut them off. Many major manufacturers acquiesced to the threats and refused to sell to Amazon.

104.    Further, as part of the group boycott, Defendants threatened to cut off several online sites for medical supply sales unless they agreed not to resell to dental offices. For instance, Schein and Patterson sell some products that are used both by medical offices and dental offices. These cross-over products can be obtained through online discounters for medical offices. However, as part of the group boycott these online discounters are specifically forbidden to sell the exact same products to dental practices. The websites require purchasers to certify that they are not dental offices in order to be allowed to buy these products. There is no rational or efficiency justification for these sales restrictions.

## DIRECT WRITTEN EVIDENCE OF CONSPIRACY

105.    There is a plethora of direct written evidence that each Defendant had a conscious commitment to the overarching conspiracy to fix prices above competitive levels by implementing jointly three schemes.

106.    **Boycott of Buying Groups.** Multiple written communications reflect an explicit Defendant agreement implementing this scheme. *Supra ¶¶* 15-16, 21-22.  For example: "Schein, Benco, and Patterson have always said no [to buying groups,]" and "neither Schein nor Patterson do [buying groups] either." Benco and Schein entered into an explicit agreement to refuse buying group customers in 2011 and Patterson also explicitly joined. *Supra ¶¶* 19-21.

107.     Taken as a whole, these repeated inter-firm communications, internal references to them, internal references to bidding positions, and changes in Defendant behavior toward buying groups all demonstrate an agreement to refuse to deal with, and discount to, buying groups. Defendants implemented and monitored their agreed conspiracy to avoid cheating. *Supra* ¶ 28

108.     **Fixing of Pricing at Specific Levels.**  Here again there is much direct written (and highly-specific) evidence of a conscious commitment to a common scheme implemented over an extended period.  A Patterson employee who from 2011 to 2015 was responsible for dental sales was not permitted to go below set minimum thresholds for gross margins of 28% to30% on supplies and was regularly informed by others within Patterson that they knew that Schein would not go below a certain price. *Supra* ¶ 39.  A former sales representative, who worked for Patterson and Benco, learned about gross margin thresholds at both companies from his managers, at monthly sales meetings, and during training sessions. At both companies, the minimum margins were similar during his entire 15-year tenure in the industry. *Supra* ¶ 40.

109.     That Benco, a supposed competitor of companies facing a serious antitrust lawsuit in which Benco was not named, would offer in August 2012 to pay to make a contemplated Archer antitrust law suit go away to protect its supposed competitors is an action against self-interest indicative of collusive behavior. *Supra* ¶¶ 41-42.

110.     In June of 2008, suffering from the Defendants' group boycott, Archer's Pettus, met with the largest Defendant in the person of Schein's Lowery and Burkhart's Powers. In that meeting, Pettus learned of the Defendants' long-standing price fixing conspiracy. Messrs. Lowery and Powers offered to end the group boycott of Archer's suppliers if Archer agreed to maintain margins on their sales of dental products between 32% to 34%, the margins agreed upon by the conspirators. *Supra* ¶ 46.

111.     Archer's Pettus pointedly asked what he had to do to "get along" with Defendants, to "get to a professional level" or be "accepted into the market" "just like a [Burkhart] or a Patterson is." Schein's Lowery reiterated that Archer's low pricing, or "drawer dropping," was the problem:

> . . . [W] all have the ability to drop our drawers. You know we do. But . . . that's part of . . . the mutual respect with Jack . . . We all want to make a living. We  . . . all . . . are going to sell . . . at a good price where we all get paid.

112.     Pettus asked whether "if I focus on that, if I maintain margins high, can I . . . rest assured that we're," and Lowery interrupted "[l]et's all just, you know, have the same goal in mind. . . . So that way it takes us out of the loop as far as slugging it out [on margins], and the doctor gets it for the same price no matter who they buy it from." *Supra* ¶ 58.

113.     Questioning what the "same price" was, Pettus noted, "I don't know what's good and what's bad," but before he could finish Lowery again interrupted, "North of 32 [percent margins]." Surprised by the high number, Pettus responded, "Really?" Mr. Lowery: "Yeah." *Supra* ¶ 61.

114.     **Boycott Suppliers and State Dental Associations Doing Business with Discounting Competitors.** The Defendants also directly agreed to boycott suppliers and state dental associations doing business with discounting competitors such as Source One, Amazon, and Archer.

115.     As far back as 2008 direct, written evidence of communications demonstrate that Defendants implemented their agreement to boycott manufacturers to suppress competition from Archer's discounting joint venture. With the advent of another efficient national competitor, Source One, also threatening Defendants' cartelized prices and sizeable profit margins, multiple communications are additional direct evidence that they expanded their boycott beyond manufacturers supplying discounters to encompass state dental associations threatening to do

business with SourceOne. *Supra* ¶¶ 89-91 & 96.

116.    Defendants threatened manufacturers in concert: should they sell their products through SourceOne, Defendants as the three largest distributors would refuse to sell or refuse to actively promote the manufactures' products. The effectiveness and persistence of the boycott is demonstrated by SourceOne's abrupt loss of access to dozens of product lines, including many of its most important and highest-selling items. By April 2014 it had lost access to at least 75% of its top selling products, crippling its ability to compete with Defendants. *Supra* ¶¶ 73-74.

117.    There is also much direct, written evidence Defendants boycotted multiple annual meetings and trade shows of state dental associations that were forming buying groups and doing business with SourceOne and threatened to boycott those that were considering the same. *Supra* ¶¶ 80-99.

## CIRCUMSTANTIAL EVIDENCE OF CONSPIRACY

118.    As set out above, there is overwhelming direct written evidence that Defendants' consciously committed to the three schemes to fix pricing at above competitive levels. Thus, evidence of "plus" factors is not necessary here to demonstrate collusion in the relevant market(s) for the distribution of dental supplies. Nonetheless, this evidence abounds as well.

119.    **Common Motive to Enter into the Conspiracy.**  Each of the Defendants believed buying groups were a threat to their pricing and margins. They were wary that a full-service distributor partnering with a buying group would open the floodgates to lower prices and lower margins, much like group purchasing organizations in the medical industry. The threat was particularly acute because buying groups were growing in popularity. *Supra* ¶ 16

120.    While buying groups posed a threat to the industry, they also represented a profitable customer segment for each of the Defendants to serve. Their motivation to enter into an

agreement not to provide discounts to or otherwise compete for buying groups was contingent on the other Defendants doing the same. Their shared motive to act collectively against the rise of buying groups is an important plus factor evincing the illegal agreement.

121.    **Unexplained, Concealed Communications with Competitors.** Unexplained communications among Defendants strongly point toward their conspiracy.  As set out above there is abundant evidence of unexplained competitor communications involving competitively sensitive information. Defendants themselves have testified that their inter-firm communications made them feel "uneasy" and were "against company . . . rules." *Supra* ¶ 17.  They were transmitted among high-level executives at Schein, Patterson, and Benco. *Supra* ¶ 15.  The exchanges involved sensitive business information, divulging Defendants' strategies as to all three schemes advancing the price fixing conspiracy. Defendants took care to keep these communications concealed.

122.    **Actions Against Self-Interest.** Defendants' decisions to pursue the three anticompetitive schemes were all against each of their individual self-interests if they were honest and vigorous competitors as to price.  An agreement to conspire to fix pricing is the only reason for these profit-seeking companies might engage in a pattern of sharing sensitive business information with their biggest rivals.

123.    **Changes in Conduct.** Defendants' coordinated changes in conduct is further evidence of their illegal collusion. In many instances they significantly shifted their conduct in a manner that is consistent with an agreement and inconsistent with the notion of independent action. *See, e.g., supra* ¶¶ 19, 21 & 32.

## RELEVANT MARKET(S)

124. **Relevant Product Market.** Since Defendants have engaged in a *per se* violation of Illinois antitrust laws, no allegations as to the relevant product market, geographic market(s), or market power are required. If the Court were to find such allegations may otherwise be necessary under "quick look" analysis under the rule of reason or otherwise, the relevant product market for purposes of this action is the full line of dental supplies sold through full-service distributors to independent dental practices and the buying groups serving these practices.

125. There were approximately 200,000 independent dentists practicing in the United States in 2017, and approximately over 8,000 practicing in Illinois. The vast majority of these dentists nationwide and in Illinois are independent - solo practitioners or small group dental practices with one or a few locations. These dentists are often referred to as "private practices." Sales to independent dentists are quite profitable for Defendants.

126. To treat their patients, independent dental practices regularly consume dozens if not hundreds of different types of dental supplies. Supplies include in part acrylics, adhesive agents, alloys, anesthetics, articulating products, burs, cements and liners, crown and bridge products, pediatric crowns, endodontics, implants, impression materials, various instruments, pins and posts, retraction materials, rubber dam materials, waxes, infection control products, topical fluoride, anti-oxidant rinse, and x-ray accessories ("dental supplies").

127. Defendants also sell dental products to corporate dental practices known as dental service organizations ("DSOs"). DSOs consist of large group practices that have multiple locations combined under a single ownership structure. Class claims here are not made on behalf of these DSOs.

128.     Independent dentists have faced significant challenges over the past decade due to decreasing insurance reimbursements, increased student debt, and the growth of corporate dentistry or DSOs. Buying groups have been created as a means for the independent dentists to combat these challenges by leveraging purchasing power of a group while at the same time remaining independent. Sometimes referred to as "buying clubs," "group purchasing organizations," or "GPOs," the defining characteristic of a buying group is an entity that aggregates negotiating leverage on behalf of independent dentists.

129.     Dentists can also purchase supplies from mail-order/internet distributors and, to some extent, from direct-selling manufacturers. Unlike the full-service distributors, mail-order or internet distributors do not generally employ sales representatives or service technicians.  Finally, dentists can purchase only certain limited supplies from direct-selling manufacturers. Direct-selling manufacturers typically specialize in niche products, such as root canal supplies. They do not typically sell the full array of products that a dentist would need to run their business; instead, many of the products are only available through distributors.

130.     No reasonable substitute exists for the supplies and services offered by full-service distributors such as Defendants to independent dentists. Defendants and other full-service distributors purchase dental supplies from dental manufacturers and resell them directly to independent dentists or their Buying Groups. They charge the dental practices the products' costs of manufacture plus distribution fees (typically set as a percentage of costs).

131.     Full-service distributors offer one-stop shop for a comprehensive selection of supplies, with thousands of SKUs across all major product categories. They also offer value-added services to customers through their sales and service teams, including sales representative support, and business and practice-management solutions. Full-service distributors typically deliver within

a day or two. This is important because it allows dentists to avoid carrying large inventories in their office space. Approximately 75% of all dental supplies are sold through these distributors.

132.    Mail-order internet distributors are not an adequate substitute for full-service distributors to independent dentists. While some mail-order and internet distributors offer a comprehensive selection of supplies, none of them provides the breadth of additional services available through full-service distributors. Mail-order and internet distributors typically do not employ sales and service teams as part of their standard business model, nor do they offer other business and practice-management solutions.

133.    Individual manufacturers are also not an adequate supply substitute for full-service distributors. Manufacturers that sell directly to dentists represent a small percentage of the total sale of dental products in Illinois and nationwide. Direct-selling manufacturers do not offer a full array of dental products and cannot provide the convenience of "one-stop-shopping" available through distributors. Typically, direct-selling manufacturers sell niche and specialty products. Therefore, even if a dental practice were inclined to purchase only directly from manufacturers, it would be unable to access the comprehensive selection of products available from full-service distributors and some mail-order and internet distributors.

134.    Because of the burden, expense, and inefficiency associated with purchasing, processing, and receiving orders from dozens of manufacturers, dental practices do not find purchasing directly from them a reasonable substitute for purchasing through distributors. By using the latter, practices can place, process, and receive fewer orders and shipments, saving both time and money as compared with ordering each of the various products they need from the individual manufacturers. Moreover, manufacturers themselves often lack their own distribution channels necessary to service the practices efficiently and in a timely manner. Some manufacturers do not

even offer direct purchasing options. Thus, manufacturers cannot substantially discipline Defendants' collusive, unlawful pricing.

135.   **Relevant Geographic Market(s)**. The relevant geographic markets are no larger than the United States and regional geographic markets contained therein.

136.   With the exception of buying groups whose members purchase products throughout the United States, competition for sales among full-service distributors for the sale of dental supplies to independent dentists occurs regionally. Independent dentists typically cannot store and manage large quantities of supplies in-house and rely on frequent, small quantity orders. The need for prompt supply delivery and same-day servicing to the customer's office or member location(s) typically limits the scope of regional markets.

137.   Independent dentists who are members of buying groups that span a broad geographic area require a full-service distributor with a dispersed network of distribution centers and field sales representatives to provide prompt product delivery and same-day servicing to each, or nearly each, buying group member location.

138.   **Market Power.**   Defendants have collusively achieved and maintained market power over the relevant market(s) for the full-service distribution of dental supplies. They have the power to raise supply prices significantly above competitive levels without losing sufficient sales in a relevant market to make this above-competitive pricing unprofitable. The conspiracy controls between 80% and 90% of sales in the relevant market.

139.   Defendants are the only full-service distributors that compete nationally for independent dentists. Collectively, Benco, Schein, and Patterson control between 80% and 90% of all full- service distributor sales of dental supplies nationwide. With sales and service centers interspersed throughout the nation, they are also the largest, or the only, full-service distributors in

many regional areas. Defendants collectively have substantial market power in all, or most, of the relevant market(s), however defined.

140.     ***Susceptibility of the Distribution Market(s) to Collusion.*** The relevant market(s) have several characteristics making them susceptible to collusion, which allows the conspiracy to maintain substantial market power and above-competitive pricing. The distribution of supplies is highly concentrated. In total Defendants sell between 80% and 90% of the distribution services in each relevant market. The Herfindahl-Hirschman Index ("HHI") is a common measure of industry concentration utilized by the United States Department of Justice, the Federal Trade Commission, and economists. The HHI is over 3,000 for in each relevant market. An HHI over 2,500 denominates a "highly concentrated" market. This high market concentration has made it much easier for Defendants to collude to fix prices.

141.     ***High Barriers to Entry.*** The relevant market(s) have high entry barriers, greatly strengthened by Defendants' boycotting of manufacturers serving Defendants' discounting competitors to buying groups and independent dentists. In addition, a state dental association's aggregating purchases of independent dentists into a state-wide buying group is a crucial link in distribution to the independent dentists by Defendants' competitors.

142.     ***Static Demand.*** The relevant market(s) are characterized by relatively static demand because adults and children receive routine dental care and demand for this dental care is directly correlated with the demand for dental supplies. Faced with static demand, distributors in a competitive market seek to undercut one another's pricing to obtain market share. Here, the Defendants' fear of this lower pricing has created a strong incentive for their collusion.

## HARM TO COMPETITION

143.     With their collusion as the vastly-dominant full-service distributors, Defendants

have managed to fix prices year-after-year across a broad range of supplies. Their fixed pricing has been inconsistent with full and vigorous price competition and strongly supports the inference that competition has been distorted and suppressed by their collusion.

144.    The harm to competition from Defendants' price-fixing is readily apparent in their steadily- increasing prices in the face of static demand for dental supplies, as well the exclusion of competition from their discounting competitors. As demonstrated in the attached Figure 1 attached to this Complaint, Defendants have raised prices in virtual lock step every year since at least 2005, including in 2009 when one of the most uncertain economic times since the Great Depression caused dental patients to defer dental expenses and demand for dental services declined by 2%.

145.    Defendants have enjoyed substantial net profit margins above competitive levels, with Patterson reaching a high of 11% in 2010 and 2011. These high margins contrast sharply with those observed, for example, in the medical distribution sector. Margins for the large pharmaceutical distributors there in the United States (McKesson, Cardinal Health, and AmerisourceBergen) range from 0.2% to 1.5%.

146.    Accordingly, Defendants have been a material cause of harm to competition and the antitrust price injury inflicted directly on Illinois independent dental practices and buying groups serving these practices, as well as injury indirectly suffered by members of the proposed Illinois Class buying dental care from these practices.

147.    Defendants' conduct has also harmed competition by reducing choice for independent dental practices and buying groups, as well as by diminishing distribution innovation by companies such as Source One, Amazon, and Archer. There are no legitimate, non-pretextual, procompetitive justifications for Defendants' long-term anticompetitive conduct.

148.    The Defendants' anticompetitive conduct is continuing and so is the indirect price

injury  suffered by members of the Illinois Class.

## ANTITRUST INJURY

149.    The proposed Class has experienced an injury of the type the Illinois Antitrust Act is intended to prevent and remedy

150.    The dental supplies distributed by Defendants are incorporated into dental services and procedures purchased or paid for by members of the proposed Class.

151.    From the perspective of the patients using the services of independent dentists, the dental supplies have no value in and of themselves: they only have value to the extent they are used in providing them dental services. The demand for dental supplies and for the distribution of those supplies directly derive from the demand for dental services for which the supplies are used.

152.    Thus, although the proposed Class does not directly participate in the market for the distribution of such supplies, the Illinois market(s) in which it does participate to purchase for dental services is inextricably intertwined with the relevant market(s) for distribution of dental supplies.

153.    The overcharging in the relevant market(s) for distribution of dental supplies affects the pricing in the Illinois market(s) for the sale of dental services in a traceable way.

154.    The pricing charged by full-service distributors of dental supplies to Illinois independent dentists makes up a substantial and identifiable portion of the pricing for dental services they provide. Thus, the pricing for dental supplies charged by full-service distributors to independent dentists is a key contributor to the prices charged by the latter for dental services.

155.    Furthermore, dental supplies are identifiable, discrete physical objects that follow a traceable physical chain from their manufacturers to Defendants to Illinois independent dental

practices. The above-competitive pricing of such supplies by the Defendant distributors inevitably results in increased pricing for the dental services in which the supplies are used, in an amount that can be determined through econometric analysis.

## STANDING

156.    Only the Illinois State Attorney General has standing in the state courts of Illinois to pursue indirect purchaser remedy under Section 10/7(2) of the Illinois Antitrust Statute, 740 Ill. Comp. Stat.  § 10/7(2).  However, this remedy can be pursued by Plaintiff and the proposed Illinois Class of Purchasers of Dental Care in this federal court pursuant to Fed. R. Civ. P. 23. *In re Broker Chicken Antitrust Litigation*, 290 F. Supp. 3d 772, 816-818 (N.D. Ill. 2017). *See also Shady Grove Orthopedic Assoc., P.A. v. Allstate Insurance Co*., 559 U.S. 393, 408 (2010).

157.    Further, Plaintiff has constitutional and statutory standing because it has suffered antitrust price injury when purchasing dental services that is fairly traceable to the Defendants' conspiracy to suppress competition in the relevant market(s).

## CLASS ACTION ALLEGATIONS

### Illinois Class of Purchasers of Dental Care

158.    Plaintiff brings this class action on behalf of the following class (the "Illinois Class of Purchasers of Dental Care"):

> Plaintiff represents a Class of all persons residing in Illinois purchasing and/or reimbursing for dental care provided by independent Illinois dental practices purchasing dental supplies from the Defendants, or purchasing from buying groups purchasing these supplies from the Defendants, or after January 29, 2015.

> Excluded from the class are: (1) Illinois dental service organizations ("DSOs") which consist of large group practices that have more than three locations combined under a single ownership structure; (2) employees of Defendants or their affiliates; and (3) the Presiding Judge and employees of this Court, as well any Appellate Judges reviewing any findings in this matter and any employees of the Appellate Court.

159.    Prosecution of the claims of the Class as a class action is appropriate under Fed. R. Civ. P. 23(a) because:

(a) The number of persons in the Class is in the millions, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Plaintiff's lack of knowledge of the identity and addresses of all members of the Class.

(b) There are numerous questions of law and fact arising from the pattern of conspirators' restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether the Defendants have engaged in *per se* restraint of trade; and (2) whether this conduct, taken as a whole, has materially caused antitrust price injury to be inflicted indirectly on members of the Class.

(c) The claims of the Plaintiff are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Plaintiff and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

(d) The Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Plaintiff and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Plaintiff and the other members of the Class.

160.    In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a) Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b) A class action is superior to other methods for the fair and efficient resolution of the controversy.

161.    In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the claims of the Class as a whole.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Illinois Antitrust Act

162.    Plaintiff incorporates by reference the foregoing allegations set forth above as if fully set forth herein.

163.    Defendants' conspiracy unreasonably restrains trade and is *per se* unlawful under the Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/3(2), 10/7(2), by increasing the price and reducing the supply of dental supplies; and restraining trade and preventing competition in the relevant market(s) for the distribution of dental supplies encompassing Illinois.

164.    In the alternative, Defendants' conduct is unlawful under "quick-look" or truncated rule of reason analysis.

165.    As a result of Defendants' unlawful conduct, competition has been harmed for the distribution of dental supplies and members of the Illinois Class of Purchasers of Dental Care have suffered indirect antitrust price injury in their business or property and have been deprived of the benefits of full competition.

166.    Plaintiff is entitled to treble damages and an injunction against Defendants

preventing and restraining the continuing violations alleged herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays that:

A.     This Court declare that Defendants have engaged in a *per se* unreasonable conspiracy to restrain trade in the relevant markets.

B.     This Court permanently enjoin Defendants and their agents and employees from continuing their unlawful acts set forth herein;

C.     Plaintiff and the members of the Illinois Class of Purchasers of Dental Services recover their actual damages, in an amount to be determined at trial, and threefold the damages they have sustained, and will have sustained, as a result of the violations alleged here, pursuant to Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/7(2);

D.     Plaintiff and the members of the Class recover their reasonable attorneys' fees and costs of suit; and

E.     Plaintiff and the members of the Class recover pre-judgment and post-judgment interest on the above sums at the rate allowed by law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims alleged herein so triable.

Dated: January 29, 2019

<u>/s/ R. Stephen Berry</u>
**BERRY LAW PLLC**
1100 Connecticut Avenue, NW, Suite 645
Washington, DC 20036
Telephone: (202) 296-3020
Fax: (202) 296-3038
sberry@berrylawpllc.com

**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS, LLP**
Todd M. Schneider
Jason H. Kim
(*pro hac vice* petitions forthcoming)
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Fax: (415) 421-7105
tschneider@schneiderwallace.com
jkim@schneiderwallace.com

**MCKOOL SMITH**
Lewis T. LeClair
(*pro hac vice* petition forthcoming)
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Fax: (214) 978-4044
lleclair@mckoolsmith.com

Attorneys for Plaintiffs