IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| R. LAWRENCE HATCHETT, M.D., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HENRY SCHEIN, INC., PATTERSON CO., INC., BENCO DENTAL SUPPLY CO., and UNNAMED BECTON DISTRIBUTOR CO-CONSPIRATORS,<br><br>Defendants. | Case No. 3:19-CV-83-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for lack of standing and failure to state a claim (Doc. 35) and a Motion to Dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction (Doc. 36) filed jointly by Defendants Benco Dental Supply Co., Henry Schein, Inc., and Patterson Co., Inc. For the reasons set forth below, the motion to dismiss for lack of standing is granted, and the motion to dismiss for lack of personal jurisdiction is denied as moot.

### BACKGROUND

Plaintiff R. Lawrence Hatchett, M.D., initiated this action on behalf of himself and a proposed class of persons who have purchased dental care in Illinois, alleging they have been overcharged by a long-term, price-fixing conspiracy implemented by dental supply

distributors Henry Schein, Inc., Patterson Companies, Inc., and Benco Dental Supply Company (collectively "Defendants") (Doc. 1).

Defendants are the three largest distributors of dental supplies in the United States (*Id.* at ¶ 1). Hatchett alleges Defendants have engaged in anti-competitive schemes, which have allowed them to fix prices at well above competitive levels and earn historically high profit margins (*Id.* at ¶ 2). First, Hatchett claims Defendants have boycotted dental buying groups, which foster competition by endorsing or joint venturing with discounting distributors competing with Defendants and provide these competitors with access to Illinois independent dentists (*Id.*). Second, Hatchett alleges Defendants have expressly agreed to fix their pricing at specific, above-competitive levels that are consistent with maintaining their gross margins in the range of 26 percent to 28 percent or more and well-above competitive returns (*Id.* at ¶ 3). Third, Hatchett asserts Defendants have conspired to prevent the entry and expansion of competing, discounting distributors by boycotting, or threatening to boycott, manufacturers supplying the discounters by denying these manufacturers Defendants' distribution (*Id.* at ¶ 4). They also have colluded to boycott, or threatened to boycott, the trade shows of state dental associations promoting state-wide buying groups seeking to generate supply savings for their independent dentists (*Id.*).

Hatchett claims these actions violate the Illinois Antitrust Act, 740 ILL. COMP. STAT. §§ 10/3(2), 10/7(2), by increasing the price and reducing the supply of dental supplies and by restraining trade and preventing competition in the relevant markets for the distribution of dental supplies in Illinois (*Id.* at ¶ 163). Hatchett further claims the Class

members have suffered indirect antitrust price injury in their business or property and have been deprived of the benefits of full competition (*Id.* at ¶ 165). As relief, Hatchett requests actual damages, treble damages, a permanent injunction enjoining Defendants from continuing the alleged unlawful acts, attorneys' fees and costs, and pre-judgment and post-judgment interest.

Defendants have moved to dismiss the Class Action Complaint, in its entirety and with prejudice, pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure. Defendants argue that the Complaint must be dismissed because Hatchett lacks standing to pursue a class action under the Illinois Antitrust Act and because he lacks standing under Article III of the Constitution. They further assert that he lacks antitrust injury and antitrust standing under the Illinois Antitrust Act. Defendants separately contend that Hatchett has failed to plead any basis for this Court to exercise personal jurisdiction over Defendants. Thus, the Complaint must be dismissed.

## LEGAL STANDARD

To survive a motion seeking dismissal under Rule 12(b)(1), a plaintiff must "clearly allege facts demonstrating each element" required to establish standing. *See Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). Whether a defendant argues that a complaint fails to (1) properly state a claim, or (2) properly plead the elements of standing, courts apply the same analysis. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). The factual allegations contained within a complaint must "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554-55 (2007) (internal citations omitted).

I.  **Standing Under the Illinois Antitrust Act**

Defendants first assert Hatchett lacks standing to pursue a class action under the Illinois Antitrust Act, which provides "that no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General." 740 Ill. COMP. STAT. §10/7(2). Hatchett maintains, however, that Illinois's restriction on class actions is a procedural limitation that is inapplicable in federal court, where Rule 23 of the Federal Rules of Civil Procedure governs whether a case may be maintained as a class action.

In *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Company*, the Supreme Court addressed whether a New York class action bar conflicted with Rule 23 and, if so, whether the federal rule or the state rule applied. 559 U.S. 393 (2010). A majority of the Court agreed that the New York statute conflicted with Rule 23, but a plurality found that the federal rule applied. *Id.* The plurality held that the New York statute did not bar class actions under New York law in federal court because Rule 23 is a procedural and not a substantive rule. *Id.* at 408. Justice Stevens concurred in the judgment, but reasoned the proper analysis is not whether Rule 23 is procedural, but whether the state law is procedural but "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Id.* at 420 (J. Stevens, concurring).

In the wake of *Shady Grove*, there has been a split of authority on the issue of whether the Illinois Antitrust Act's class action prohibition is part of Illinois's

"substantive rights or remedies." *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 763–65 (N.D. Ill. 2019), *reconsideration denied*, No. 17 C 50107, 2019 WL 2763181 (N.D. Ill. May 3, 2019). Many federal district courts have treated Justice Stevens's "framework of substantive rights or remedies" concurrence as controlling because it was decided "on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (when no rationale of the Supreme Court achieves a majority, the Court's holding is the position taken by those who concurred "on the narrowest grounds"). Those courts have then found that the Illinois Antitrust Act's restriction on indirect purchaser class actions is intertwined with the State's substantive rights and remedies. This is because "the limitations on indirect purchaser actions in the IAA were enacted in the same paragraph of the same statute as the state-created right and are accompanied by other substantive limitations." *In re Wellbutrin XL Antitrust Litig.*, 756 F.Supp.2d 670, 677 (E.D. Pa. 2010). "Furthermore, courts have observed that the Illinois statute represents a policy judgment as to the feasibility of managing duplicative recovery, which the legislature has entrusted to the Attorney General but not to individual indirect purchasers." *Id.* For these reasons, several federal courts have found that applying Rule 23 would "abridge, enlarge or modify Illinois' substantive rights" and have, therefore, dismissed class action claims under the Illinois Antitrust Act. *See, e.g.*, *In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 834 (E.D. Pa. 2019); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352 (D.R.I. 2019); *In re Effexor Antitrust Litig.*, 357 F.Supp.3d 363, 392, 2018 WL 6003893, at *16 (D.N.J. 2018); *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 417–18 (D.N.J. 2018); *In re Opana ER Antitrust Litig.*, 162 F.Supp.3d 704, 723 (N.D. Ill. 2016).

Others have taken a more nuanced approach to Justice Stevens's concurrence, however, doubting whether the concurrence controls in the first place. In *In re Aggrenox Antitrust Litigation*, the District of Connecticut explained:

> [T]he doctrine that in a split decision the controlling rationale is that taken by the Justices who concur in the judgment on the narrowest grounds—works only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment. The Stevens concurrence is narrower than the position of the other Justices who made up the *Shady Grove* majority only in the sense that it would reject state procedural rules in fewer cases. It is not logically narrower, however, because it is not a logical subset of the opinion of the other Justices in the majority. Those Justices do not implicitly approve of its rationale for sometimes allowing state procedural rules to control—on the contrary, they explicitly reject that rationale—and it therefore does not represent the common denominator of the Court's reasoning.

*In re Aggrenox Antitrust Litig.*, No. 3:14-MD-2516 (SRU), 2016 WL 4204478, at *5 (D. Conn. Aug. 9, 2016) (internal citation and quotations omitted).

"Although the Seventh Circuit has not squarely addressed which opinion controls, it otherwise has indicated that Justice Scalia's plurality sets forth the controlling legal standard." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 552–53 (N.D. Ill. 2019) (citing *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 564 (7th Cir. 2011) (*Shady Grove* "holds that Rule 23 applies to all federal civil suits, even if that prevents achieving some other objective that a court thinks valuable")). Indeed, district courts in the Northern District of Illinois recently have agreed with the reasoning in *Aggrenox* and concluded that even if Justice Stevens's concurrence was persuasive dicta, the Illinois Antitrust Act did not alter the scope of any substantive right or remedy "because any indirect purchaser procedurally blocked from participation in a class action

would still have the same remedy in an individual action." *Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d at 764 (quoting *Aggrenox*, 2016 WL 4204478, at *6); *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 552–53 (N.D. Ill. 2019) ("Even if Justice Stevens's plurality opinion applied, Defendant has not identified any authority for concluding that the class action bars at issue are so intertwined with a state-created right or remedy as to justify finding that it trumps Rule 23 . . . ."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817–18 (N.D. Ill. 2017) ("The availability of the class action procedure does not change the substantive rights or remedies available to [indirect purchasers] under Illinois law.").

The undersigned agrees with this latter approach. Even if Justice Stevens's concurrence controls, allowing indirect purchasers to bring a class action in federal court under Rule 23 does not enlarge their substantive rights under Illinois law. Indirect purchasers are allowed to sue in state court under the Illinois Antitrust Act, just not under the procedural device of a class action. *See Shady Grove*, 559 U.S. at 408 ("A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits. And like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged."). As explained in *Shady Grove*, the fact that a dispute is brought as a class action—thereby transforming the claim for a $500 penalty into a $5 million penalty—does not change the defendant's aggregate liability. *Id.* While it "is undoubtedly true that some plaintiffs who would not bring individual suits for the relatively small sums involved will choose to join a class action," that has no effect on a defendant or

plaintiff's legal rights. *Id.*

Because the Court finds that Rule 23 permits Hatchett to maintain this matter as a class action, and because doing so does not enlarge the substantive rights or remedies available to Hatchett and the proposed class under Illinois law, the Court finds that Hatchett has standing under the Illinois Antitrust Act to bring a class action. Accordingly, the Court denies Defendants' motion to dismiss on this basis.

## II. Article III Standing

Defendants next argue the Complaint should be dismissed for failure to plead facts demonstrating Hatchett has standing to assert his claim under Article III of the Constitution. Defendants specifically challenge Hatchett's allegations regarding his injury in fact and whether that injury is fairly traceable to Defendants' conduct.

With regard to Article III standing, a plaintiff must show (1) injury in fact, meaning an invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of such that the injury is fairly traceable to the defendant's actions; and (3) that a favorable decision is likely to redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Second, the injury must be fairly traceable to the challenged conduct. *Id.* Third, the injury must be likely to be "redressed by a favorable decision." *Id.* at 561. At the pleading stage, the plaintiff must allege facts demonstrating each element of Article III standing. *Crabtree v. Experian Info. Sols., Inc.*, No. 18-3405, 2020 WL 428938, at *2 (7th Cir. Jan. 28, 2020). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss

we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal quotation omitted).

### A. Injury in Fact

A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Crabtree*, 2020 WL 428938, at *3 (quoting *Lujan*, 504 U.S. at 560 n.1). "Concreteness means that the injury must exist: it must be 'real', not abstract." *Id.* (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548, 194 L.Ed.2d 635 (2016)). According to Defendants, Hatchett has not alleged a particularized injury because does not say how much he was overcharged, whether his dentists accounted for the costs of those supplies in determining their prices for dental procedures, or whether his dentists billed him for the costs of these supplies.

The Court disagrees. Hatchett alleges that he paid several hundred dollars for dental services and procedures including a crown, molar extraction, and other procedures provided by two independent dentists who purchased supplies, in part, from Defendant Schein (Doc. 1 at ¶ 9). Those supplies included x-ray accessories, materials associated with crown installation (impression materials, instruments, etc.), binding/cement material, core build-up material including pins, topical fluoride, and anti-oxidant rinse (*Id.*). Hatchett further alleges he was overcharged for these services because his dentists obtained at least some of their supplies from Defendant Schein, which he claims conspired with the other Defendants to engage in price fixing (*Id.*). Finally, Hatchett claims that the prices charged by dental supply distributors to dentists constitutes "a substantial and identifiable portion of the pricing for dental services they

provide." (*Id.* at ¶ 154). "The above-competitive pricing of such supplies by the Defendant distributors inevitably results in increased pricing for the dental services in which the supplies are used, in an amount that can be determined through econometric analysis." (*Id.* at ¶ 155). While these allegations do not specify the exact amount of any overcharges Hatchett experienced as a result of Defendants' conduct, the Court finds that they are sufficient to establish an injury in fact at the pleading stage.

### B. Traceability

To satisfy the causation prong of Article III standing, the injury complained of "must be fairly traceable to the challenged action of the defendant—i.e., there must be a causal connection between the injury and the conduct." *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014). According to Defendants, Hatchett has made merely conclusory legal assertions that fail to support his conclusion that his claimed overpayments are traceable to Defendants.

Hatchett alleges, however, that his dentists purchased supplies from Schein, which is alleged to have conspired with the other two defendants. He further alleges facts about the dental supply distribution chain, that Defendants account for 80 to 90 percent of full-service dental supply distribution, and that the products distributed by Defendants can be traced from their manufacturers, to distributors like Defendants, to dental practices. Finally, he alleges, the price for those products is a substantial factor in the prices charged for dental services. Based on these facts, the Court finds that it is plausible that Hatchett's injuries are "fairly traceable" to Defendants' alleged price-fixing conspiracy. *See Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 696 (7th Cir. 2015) (citing *In re Target Corp. Data*

*Sec. Breach Litig.*, 66 F.Supp.3d 1154, 1159 (D. Minn. 2014) ("Plaintiffs' allegations plausibly allege that they suffered injuries that are 'fairly traceable' to Target's conduct. This is sufficient at this stage to plead standing. Should discovery fail to bear out Plaintiffs' allegations, Target may move for summary judgment on the issue.")).

While Defendants make no argument that Hatchett's complaints could not be redressed by a favorable decision, the Court also finds that element to be satisfied. Any judgment in favor of Hatchett and his proposed class would serve to redress the alleged overpayment. Accordingly, Hatchett has met the requirements for Article III standing.

### III. Antitrust Injury and Standing

Defendants next assert that Hatchett has failed to demonstrate antitrust injury and antitrust standing, both of which are required under the Illinois Antitrust Act. *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1066 (7th Cir. 1997) ("Federal antitrust standing rules apply under the Illinois Antitrust Act."); *McGarry & McGarry LLP v. Bankr. Mgmt. Solutions, Inc.*, No. 17 CV 5779, 2018 WL 3218659, at *2 (N.D. Ill. July 2, 2018), *aff'd sub nom. McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056 (7th Cir. 2019) ("Illinois courts have adopted a common-law harmonization provision, meaning that they interpret their antitrust laws in harmony with federal-court decisions interpreting federal antitrust law.").

#### A. Antitrust Injury

First, Defendants argue Hatchett does not participate in the dental supply market; thus, he cannot plead antitrust injury from a purported conspiracy in that market.

Federal antitrust law provides a treble-damages remedy to "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). The Supreme Court has limited those who may bring an antitrust action to "(1) those who have suffered the type of injury that the antitrust laws were intended to prevent and (2) those whose injuries are a result of the defendant's unlawful conduct." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 595 (7th Cir. 1995) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 697, 50 L. Ed. 2d 701 (1977)). "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Some injuries are "too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit." *Id.* at 477, 102 S.Ct. 2540.

Courts "usually presume that competitors and consumers in the relevant market are the only parties who suffer antitrust injuries and are in a position to efficiently vindicate the antitrust laws." *McGarry*, 937 F.3d at 1065; *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1379 (7th Cir. 1987) (antitrust injury requires a plaintiff to show that it was a participant in the relevant market); *see also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained.").

If a party is neither a purchaser nor a competitor in the relevant market, however, a narrow exception exists if the party's injuries are "inextricably intertwined" with the injuries of market participants. *McCready*, 457 U.S. at 484. In *McCready*, the plaintiff

sought insurance coverage for treatment by a psychologist, but her insurance plan only provided reimbursement for therapy if provided by a psychiatrist. *Id.* at 468-69. The plaintiff sued her health insurance provider and a group of psychiatrists alleging they colluded to exclude psychologists from receiving compensation under the plan. *Id.* at 469-70. While she was not a participant in the group health insurance market or the market for treatment from a psychiatrist, the Supreme Court held that she had stated a claim for antitrust injury because her "clearly foreseeable" injury was "a necessary step in effecting the ends of the alleged illegal conspiracy," and "the very means by which it is alleged that [the health insurance provider] sought to achieve its illegal ends." *Id.* at 479.

After its decision in *McCready*, the Supreme Court further explained that the plaintiff in that case "alleged that she was a consumer of psychotherapeutic services and that she had been injured by the defendants' conspiracy to restrain competition *in the market for such services.*" *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) (emphasis added) ("ACG"); *see also* IIA Areeda & Hovenkamp, Antitrust Law ¶ 339, at 145 (4th ed. 2014) (concluding that *McCready* "clearly limited" the meaning of the "inextricably intertwined" exception "to those whose injuries are the essential means by which defendants' illegal conduct brings about its ultimate injury to the marketplace").

Here, Hatchett admits in the Complaint that he and the proposed Class do not directly participate in the market for the distribution of dental supplies (Doc. 1 at ¶ 152). He alleges, however, that the market in which the Class does participate—the purchase of dental *services*—is inextricably intertwined with the relevant markets for distribution

of dental supplies, as overcharging for dental supplies affects the price of dental services in Illinois in a traceable way (*Id.* at ¶ 153). Furthermore, he claims, "[f]rom the perspective of the patients using the services of independent dentists, the dental supplies have no value in and of themselves: they only have value to the extent they are used in providing them dental services." (*Id.* at ¶ 151). Thus, Hatchett asserts, "[t]he demand for dental supplies and for the distribution of those supplies directly derive from the demand for dental services for which the supplies are used." (*Id.*).

The Northern District's decision in *Supreme Auto Transport v. Arcelor Mittal* is instructive here. In that case, indirect purchasers of steel brought a putative class action against domestic steel manufacturers, alleging the manufacturers reduced steel production in an effort to drive up the price of steel. *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1036 (N.D. Ill. 2017). The direct purchasers of steel then passed on the higher prices to downstream customers like the plaintiffs, who bought consumer products made with steel as well as other materials. *Id.*

In determining whether the plaintiffs had suffered an antitrust injury, the court noted that while the plaintiffs made conclusory allegations about causation, the complaint did not acknowledge the role of interceding parties who purchased and distributed the raw steel from the defendants. *Id.* at 1040. The Court ultimately decided that although the plaintiffs "may have paid inflated prices for steel-containing products, the alleged scheme would have been just as effective from defendants' point of view if direct purchasers of steel paid supracompetitive prices for raw steel and never passed that cost on to consumers." *Id.* at 1041. Because the indirect purchasers only purchased

the steel as a component part of mixed material products, plaintiffs failed to demonstrate antitrust injury. *Id.* The Seventh Circuit affirmed. *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 744 (7th Cir. 2018). In doing so, it contrasted plaintiffs' allegations that they purchased steel as a component of other, more complex products, of which steel was not even a primary or necessary ingredient, with plaintiffs in a related suit who alleged injury based on the purchase of steel items from distributors who had purchased those same items from the defendants. *Id.* In the second instance, the alleged injury was fairly traceable to the defendant steel manufacturers, whereas in the instant case, the claims were too remote to demonstrate causation. *Id.*

The Court also finds *Aluminum Warehousing* to be analogous. 833 F.3d at 162. In that case, the Second Circuit found that purchasers of aluminum-containing products such as beverages sold in aluminum cans did not establish antitrust standing when they were not participants in the defendant's market (aluminum warehousing). *Id.* Moreover, their injury was not "inextricably intertwined" with the injuries of participants in the aluminum warehousing market. *Id.* The Court explained that plaintiffs' injury was not "a necessary step" in carrying out the alleged anti-competitive conspiracy; instead, the injury was "suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme." *Id.*

The Second Circuit also rejected the indirect purchasers' argument that, without them, there would be no real-world purchasers of aluminum, and without users of physical aluminum, there would be no market for aluminum futures or aluminum warehousing. *Id.* The court noted that "[t]his approach would limitlessly increase the

the steel as a component part of mixed material products, plaintiffs failed to demonstrate antitrust injury. *Id.* The Seventh Circuit affirmed. *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 744 (7th Cir. 2018). In doing so, it contrasted plaintiffs' allegations that they purchased steel as a component of other, more complex products, of which steel was not even a primary or necessary ingredient, with plaintiffs in a related suit who alleged injury based on the purchase of steel items from distributors who had purchased those same items from the defendants. *Id.* In the second instance, the alleged injury was fairly traceable to the defendant steel manufacturers, whereas in the instant case, the claims were too remote to demonstrate causation. *Id.*

The Court also finds *Aluminum Warehousing* to be analogous. 833 F.3d at 162. In that case, the Second Circuit found that purchasers of aluminum-containing products such as beverages sold in aluminum cans did not establish antitrust standing when they were not participants in the defendant's market (aluminum warehousing). *Id.* Moreover, their injury was not "inextricably intertwined" with the injuries of participants in the aluminum warehousing market. *Id.* The Court explained that plaintiffs' injury was not "a necessary step" in carrying out the alleged anti-competitive conspiracy; instead, the injury was "suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme." *Id.*

The Second Circuit also rejected the indirect purchasers' argument that, without them, there would be no real-world purchasers of aluminum, and without users of physical aluminum, there would be no market for aluminum futures or aluminum warehousing. *Id.* The court noted that "[t]his approach would limitlessly increase the

universe of potential plaintiffs, and cannot be squared with *McCready* itself, which held that courts must apply a 'proximate cause' test to alleged antitrust injury." *Id.* (quoting *McCready*, 457 U.S. at 477–78).

Like the indirect steel and aluminum purchasers, the Court finds that Hatchett and the proposed class's alleged injuries as purchasers of dental services were "not a necessary step in carrying out the alleged anti-competitive conspiracy, but rather a 'purely incidental byproduct of the alleged scheme.'" *See Supreme Auto Transp. LLC*, 238 F. Supp. 3d at 1040–41. Nor were their injuries "clearly foreseeable" or the essential means by which Defendants' illegal conduct brought about its ultimate injury to the marketplace. *See McCready*, 457 U.S. at 479.

Assuming the facts as alleged are true, Defendants' scheme would be just as effective if dentists purchased the higher priced supplies but never passed on that cost to Plaintiffs. And, as noted in *Aluminum Warehousing*, the fact that the demand for dental services drives the market for dental supplies is inconsequential, as *McCready* demands proximate—not but-for—causation. For these reasons, the Court finds that the injuries alleged by Hatchett and the proposed class are not inextricably intertwined with the injuries of market participants: the dentists who obtained their supplies from Defendants. Therefore, Plaintiffs have not adequately pleaded antitrust injury.

## B. Antitrust Standing

Even if Hatchett had adequately pleaded antitrust injury, he must also demonstrate antitrust standing, *i.e.*, that he is the proper plaintiff to bring the claim.[1]

---

[1] In *Supreme Auto*, the Seventh Circuit eschewed the term "antitrust standing," noting that it is actually a proximate cause requirement. *Supreme Auto Transp., LLC*, 902 F.3d at 743.

"From the class of injured persons suffering an 'antitrust injury' only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action under § 4." *Serfecz*, 67 F.3d at 598 (citation omitted). The Seventh Circuit has "recognized the need to balance the interests of deterrence through private antitrust enforcement and avoidance of excessive treble damages litigation," which is achieved by allowing only those who "suffer immediate injuries with respect to their business or property, while excluding persons whose injuries were more indirectly caused by the antitrust conduct." *Id.*

The Supreme Court has identified six factors that courts should weigh in making this assessment:

> (1) [t]he causal connection between the alleged anti-trust violation and the harm to the plaintiff; (2) [i]mproper motive; (3) [w]hether the injury was of a type that Congress sought to redress with the antitrust laws; (4) [t]he directness between the injury and the market restraint; (5) [t]he speculative nature of the damages; (6) [t]he risk of duplicate recoveries or complex damages apportionment.

*ACG*, 459 U.S. at 537-46.

As discussed above, the causal connection here is weak; Hatchett alleges he overpaid for dental services on account of Defendants' actions, but he has not alleged that any specific charge he paid was related to the costs his dentist paid for specific dental supplies. And Hatchett can only speculate that his dentists passed on any additional charges to him; the actual amount of those charges, if any, certainly is unknown.

Perhaps the most important factor to the analysis in this case though is the risk of duplicate recoveries. Defendants point out that a number of other lawsuits have been filed against them by (1) dental practices and direct purchasers of dental supplies;

(2) dental supply distributors that compete directly with Defendants in the sale of dental supplies; (3) an online platform for the sale of dental supplies that competed with Defendants; and (4) a supplier of dental supplies to that online platform. In one of those cases, *In re Dental Supplies Antitrust Litig.*, No. 1:16-CV-00696-BMC-GRB (E.D.N.Y.), a settlement was granted final approval in June 2019 between a proposed class of dental practices and dental laboratories—*i.e.*, the purchasers of dental supplies who have suffered immediate injuries—and Defendants in this case. Thus, the Court agrees with Defendants that Hatchett "is not the party who can most efficiently vindicate the purposes of the antitrust laws in this case." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718 (7th Cir. 2006) (internal quotation marks and citation omitted). Because Hatchett lacks antitrust standing, his complaint must be dismissed.

## Conclusion

For these reasons, the Court **GRANTS** the Motion to Dismiss for lack of standing filed by Defendants (Doc. 35). Plaintiff's Complaint (Doc. 1) is **DISMISSED with prejudice**. Defendants' Motion to Dismiss for lack of personal jurisdiction (Doc. 36) is **DENIED as moot**. This case is closed, and the Clerk of Court is **DIRECTED** to enter judgment.

**IT IS SO ORDERED.**

DATED: February 13, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**